Kimberly JACOBS, et al., Plaintiffs,

v.

CLARK COUNTY SCHOOL DISTRICT, et al., Defendants.

No. CVS041490RLHLRL.

United States District Court,
D. Nevada.

June 10, 2005.

Allen Lichtenstein, Law Office of Allen Lichtenstein, Las Vegas, NV, JoNell Thomas, Law Office of Jonell Thomas, Las Vegas, NV, for Donald Dresser, Shane Dresser, Wendy Dresser, Lona Finley, Donald Jacobs, Kimberly Jacobs, Lynn Rose, Whitney Rose, Linda Rowley, Dwight Terry, Dwight Terry, Jr., Deanna Wright.

C.W. Hoffman, Donna Mendoza–Mitchell, Jeanne–Marie Pochert, Clark County School District, Legal Department, Las Vegas, NV, for Shirley Barber, Susan Brage-Wellman, Denise Brodsky, Clark County School Dist., Emelio Fernandez, Jr., Carlos Garcia, Ruth Johnson, Larry Mason, Sheila Moulton, Mary Veth Scow.

## ORDER

HUNT, District Judge.

(Motion to Dismiss-# 17 Motion to Dismiss-# 22 Motion to Exceed Page Limit-# 24 Cross Motion for Partial Summary Judgment—# 29)

Before the Court is Defendants' Motion to Dismiss (# 17), filed December 7, 2005, and Defendant's substantially similar Motion to Dismiss (# 22), filed January 13, 2005. The Court has also considered Plaintiffs' Opposition (# 19), filed December 27, 2005; Defendants' Reply (# 20), filed January 10, 2005; Defendants' Supplement in Support of Defendants' Motion to Dismiss (# 25), filed February 24, 2005; Plaintiff's Supplemental Opposition (# 28), filed April 4, 2005; and Defendants' Supplemental Reply (# 31), filed April 25, 2005. Also before the Court is Defendant's unopposed Motion to Exceed Page Limit (# 24), filed February 24, 2005. Also before the Court is Plaintiff's Motion for Partial Summary Judgment (# 29), filed April 4, 2005. The Court has also considered Defendants' Opposition (# 31), filed April 25, 2005, as well as Plaintiffs' Reply (# 33), filed May 15, 2005.

## BACKGROUND

This case arises from Liberty High School's attempt to enforce a mandatory dress code on one of its students, and centers on the question of whether a Nevada law allowing for the creation of a mandatory dress code, a Clark County School District regulation adopted in accordance with the Nevada law, and the individually-named Defendants' enforcement of a mandatory school uniform policy constitute impermissible restraint on speech under the First Amendment.

Plaintiff Kim Jacobs and her father were the original Plaintiffs in this action. Kim was an Eleventh Grade student at Liberty High School in Las Vegas during the fall of 2004. At that time, Liberty High had implemented what it defined as a "Campus Wardrobe," requiring students to wear Khaki pants and either red, white, or blue shirts without any printed material thereon. Liberty High claims to have adopted its wardrobe requirement pursuant to NRS 392.458 and the original Clark County School District Regulation 5131 (hereafter Original CCSD Reg. 5131).

NRS 392.458 authorizes Nevada state school districts to implement mandatory uniform policies and states, in its entirety,

1. The board of trustees of a school district may, in consultation with the schools within the district, parents and legal guardians of pupils who are enrolled in the district, and associations and organizations representing licensed educational personnel within the district, establish a policy that requires pupils to wear school uniforms.

2. The policy must:

 (a) Describe the uniforms;

 (b) Designate which pupils must wear the uniforms; and

 (c) Designate the hours or events during which the uniforms must be worn.

3. If the board of trustees of a school district establishes a policy that requires pupils to wear school uniforms, the board shall facilitate the acquisition of school uniforms for pupils whose parents or legal guardians request financial assistance to purchase the uniforms.

4. The board of trustees of a school district may establish a dress code enforceable during school hours for the teachers and other personnel employed by the board of trustees.

Pursuant to NRS 392.458, Clark County School District (hereafter CCSD) promulgated Original CCSD Reg. 5131, a regulation allowing schools to adopt a mandatory school uniform dress code and outlining the requisite actions a school must take to implement such a dress code. Original CCSD Reg. 5131 provides that CCSD schools may individually determine what is appropriate dress (Original CCSD Reg. 5131 I., II., and III., identified by Defendants as "dress restrictions" that fall short of constituting a mandatory school uniform policy), and may implement a "mandatory school uniform policy" (Original CCSD Reg. 5131 VI.) If a school desires to implement a mandatory school uniform policy, Original CCSD Reg. 5131 VI.A. provides that the school must survey all families at the school, with 51% of the surveys returned and indicating a 70% favorable response supporting school uniforms from the respondents, and the parent survey shall only present the question of whether a mandatory school uniform policy should be implemented. If the survey returns indicate that a mandatory school uniform policy is approved, notification of the adoption of the proposed policy is to be distributed to students, parents, and staff prior to the end of a current "school year," for implementation at the beginning of the subsequent school year. Original CCSD Reg. 5131 V.II.E. The Original CCSD Reg. 5131 VI.C. also provides that, where a mandatory school uniform policy has been implemented: (1) students must wear the uniform during regular school hours, subject to the principal's retained authority to grant exceptions for special occasions/events; (2) the uniform does not restrict wearing the uniform of a nationally-recognized youth organization such as the Boy Scouts or the Girl Scouts when those organizations have their meeting days; (3) a student is not considered non-compliant if wearing a school uniform violates the religious beliefs of a student or parent; (4) schools must assist in the purchase of uniforms for students who, for reason of financial hardship, cannot comply with the uniform policy; (5) parents who choose not to have their child participate in the uniform policy are eligible to apply for a zone variance so that their child may attend another school; (6) no student may receive a lowered grade because of non-compliance with the uniform policy; and (7) where a student fails to comply with the uniform policy, a conference must be held with the students' parent, and continued non-compliance will result in progressive disciplinary action. Liberty High defined its Campus Wardrobe policy as a "dress restriction" that did not amount to a mandatory student uniform policy, and asserted that such a dress restriction was exempt from the uniform policy requirements relating to the parental survey identified in Original CCSD Reg. 5131.

According to Defendants' uncontroverted factual statement and evidence, Kim was warned, reprimanded, and suspended over a six-week period for failure to abide by Liberty High's Campus Wardrobe policy, culminating in her indefinite suspension on October 27, 2004 pending a recommendation that she attend Cowan Behavior Program because of her continued non-compliance with the school's uniform policy. On October 28, 2004, Kim and her father brought suit against Clark County

School District (hereafter CCSD) and various of CCSD's employees, alleging the violation of First Amendment Expressive and Free Exercise Rights and Fourteenth Amendment due process rights, and requesting a Temporary Restraining Order and Preliminary Injunction barring the enforcement of the dress code for the duration of the litigation.

On October 29, 2004, this Court denied Plaintiffs' requested TRO, and on November 10, 2004, granted Plaintiff's requested Preliminary Injunction. The Injunction barred enforcement of the dress code policy against Kim during the litigation and was premised on the finding that Liberty High's Campus Wardrobe policy was in fact a mandatory student uniform policy under Original CCSD 5131, and that Plaintiffs were likely to prevail on the merits because Liberty High had failed to follow CCSD's own administrative regulations for enacting a mandatory dress code in that Liberty High did not conduct the requisite parent survey and that Defendants did not offer zone variances to students who did not wish to participate in the uniform policy. In the Order granting Preliminary Injunction, the Court specifically disclaimed that the Order in any way addressed the merits of the underlying First Amendment claims or applied in any way to any other of CCSD's schools that have enacted a mandatory dress code; notwithstanding, the Court noted as dicta its inclination to find that the Fifth Circuit's decision in *Canady v. Bossier Parish School Board*, 240 F.3d 437 (5th Cir.2001) had correctly applied Supreme Court precedents to find that a school district may impose content-neutral school uniforms without running afoul of the First Amendment, but that the Court held serious reservations respecting content-specific uniform exemptions made in CCSD Reg. 5131 for "nationally-recognized youth organizations such as the Boy Scouts or the Girl Scouts."

On November 18, 2004, CCSD promulgated Revised CCSD Reg. 5131, which was largely similar to the Original CCSD Reg. 5131 with a few notable exceptions. First, Revised CCSD Reg. 5131 removes the exemptions previously recognized for nationally-recognized youth organizations, such as the Boy Scouts and Girl Scouts. Second, Revised CCSD Reg. 5131 eliminates the parental survey requirements set forth in Original CCSD Reg. 5131, and provides in its stead that a uniform policy may be implemented where 55% of the surveys returned indicate a desire to implement the policy, without making reference to how many families must respond to the survey and without requiring the school to survey all student families. Finally, Revised CCSD Reg. 5131 provides for the continuity of those uniform policies adopted under the Original CCSD Reg. 5131 and allows for a non-participation option for the 2004–05 school year.

On November 24, 2004, Kim withdrew from Liberty High on the alleged basis that she suffered from the notoriety that she gained as a Plaintiff in this action, and is now living with her mother in northern Nevada. On December 7, 2004, Defendants file the pending Motion to Dismiss on the basis that Kim Jacobs' departure from Liberty High rendered Plaintiffs' claims moot and invalidated Plaintiffs' standing to sue.

On December 27, 2004, Plaintiffs filed their First Amended Complaint, naming additional Plaintiffs representing students who attended other schools within CCSD that have implemented a mandatory uniform policy. Specifically, Plaintiffs included: Dwight Terry Jr., a student at Chaparral High who, Plaintiffs allege, was sent to the principal's office for the remainder of the day on five occasions for failure to abide by the school uniform requirement, as well as his father, Dwight Terry; Shane

Dresser, a student at Bridger Middle School who, Plaintiffs allege, was threatened with disciplinary action if he did not abide by the school uniform requirement in spite of his mother's claim that she had a religious objection to a requirement that her son wear a uniform, as well as his parents, Donald and Wendy Dresser; John Doe I, a student at Taylor Elementary, as well as his mother, Lona Finley; John Doe II, a student at Taylor Elementary, as well as his mother, Deanna Wright; Whitney Rose, a student at Garside Junior High, as well as her mother, Lynn Rose. Plaintiffs also allege that: Chaparral High, Liberty High, and Jim Bridger instituted dress codes without surveying parents as required under the Original CCSD Reg. 5131; Garside High instituted a school uniform requirement even though the required parental survey did not support imposing the requirement; and Taylor Elementary instituted the uniform policy on the basis of a faulty and invalid survey process and without holding the requisite town meeting.

On January 13, 2005, Defendants filed the pending Motion to Dismiss, which is substantially similar to their previous motion. On January 25, 2005, this Court directed the parties to supplement their briefing respecting Defendants' motions in order to address the core constitutional questions in this litigation, and indicated that the Court may consider Defendants' Motions to Dismiss under the summary judgment standard. Supplemental briefing was subsequently filed. On April 4, 2005, Plaintiffs filed their pending Motion for Partial Summary Judgment.

## DISCUSSION

### I. Defendants' Motion To Exceed Page Limit

In the way of housekeeping, the Court notes that Defendants have requested permission to exceed the page limit requirements set forth in local rules in the filing of their Supplement. This Motion is unopposed, and the issues which the Court has asked the parties to address are substantial and susceptible of lengthy exposition. The Court finds that Defendants' request is not for any improper purpose and is warranted, and accordingly the Motion will be granted.

### II. Summary Judgment Standard

Defendants have brought their Motion to Dismiss on the basis of Rule 12(b)(6) of the Federal Rules of Civil Procedure, alleging that Plaintiffs failed to state a claim upon which relief can be granted. Rule 12(b) also provides, in pertinent part, that:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented and not excluded by the court, the motion shall be treated as one for summary judgment, and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

In its Order filed January 23, 2005, this Court advised the parties that it "may consider [Defendants' Motion to Dismiss as] a motion for summary judgment, if it is necessary for the parties to provide matters outside the pleadings," *Id.* at 2:8–9, and directed the parties to supplement their briefings to address the constitutional arguments at issue in this litigation. Subsequent to that Order, both the Plaintiffs and Defendants filed supplemental briefs that included submitted matters outside of the pleadings and recognized in those supplemental briefs that the Court would be considering Defendants' Motion under the summary judgment standard. *See* Defendants' Supplemental Brief in Support of Motion for Partial Summary

Judgment at 4:13–15 (noting that the Court's January 23, 2005 Order converted Defendants' Motion to Dismiss into a Motion for Summary Judgment); Plaintiffs' Opposition/Counter Motion for Partial Summary Judgment (referring to Defendants' Motion as one for "Partial Summary Judgment" and addressing the Summary Judgment standard only). In conformity with its previous indication, the parties' recognition of that indication, and given that both parties have presented matters outside of the pleadings, this Court will consider Defendants' Motion to Dismiss under the summary judgment standard.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 883 (9th Cir.1982), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983).

Once the moving party satisfies the requirements of Rule 56, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex Corp. v. Ca-*

*trett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404 (9th Cir.1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. The Jacobs Plaintiffs' Standing

 In their original Motion to Dismiss and subsequent filings, Defendants assert that the Jacobs Plaintiffs' claims should be dismissed because she and those associated with her claims lack standing. As the Ninth Circuit has noted, Plaintiffs must have standing before bringing suit in a federal court, and this standing requirement has both

constitutional and prudential dimensions. The Article III limitations are "(1) a threatened or actual distinct and palpable injury to the plaintiff; (2) a fairly traceable causal connection between the injury and the defendant's challenged conduct; and (3) a substantial likelihood that the requested relief will redress or prevent the injury." [*Hong Kong Supermarket v. Kizer,* 830 F.2d 1078, 1082 (9th Cir.1987) ]. The prudential limitations include a requirement that the plaintiff "assert his own rights, rather than rely on the rights or interests of a third party" and "allege an interest that is arguably within the zone of interests protected or regulated by the statute or constitutional guarantee in question." *Id.*

*Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.,* 24 F.3d 56, 61 (9th Cir.1994). Defendants challenge the Jacobs' standing on both constitutional and

prudential standing grounds, and the Court will address that assertion.

■ Defendants assert that constitutional and prudential standing are absent because 1) Kim no longer lives with her father, who brings this action as a "next friend" Plaintiff; 2) Kim Jacobs no longer attends school in the Clark County School District, such that CCSD Reg. 5131 no longer has any relevance for Kim; and 3) Kim has not experienced actual injury in connection with the implementation of Liberty High's mandatory uniform requirement. In opposition, Plaintiffs assert that 1) Kim's parents are both named as next-friend Plaintiffs, and there is no effort by Kim's mother to end the next-friend Plaintiff status of Kim's father; 2) Kim left Liberty because of the notoriety surrounding her case, and desires to return if and when Liberty abandons its mandatory uniform policy; and 3) Kim's past expulsion may form the basis for allegations of damages.

■ Respecting Plaintiff Donald Jacobs, the Court agrees with Plaintiffs that, so long as both of Kim's parents agree to assert jointly this litigation as next friends of Kim, they may do so as her parents, regardless of whether those parents are presently married to one another. Defendants have provided no authority to the contrary, nor so much as alleged that Kim's mother objects to Donald Jacobs' participation in this litigation. With regard to the arguments respecting the validity of Kim's claims, the Court notes that Kim has moved to Northern Nevada, and no longer attends any school belonging to CCSD. Accordingly, the question of whether CCSD Reg. 5131 or Liberty High's school uniform requirement are constitutionally valid is a moot issue as it affects Kim. However, as Plaintiffs illustrate in their Opposition/Motion for Partial Summary Judgment, Kim also alleged in her suit that NRS 392.458 is unconstitutional, and this is not obviated by Kim's relocation to another school district in Nevada; thus, Kim continues to have standing to prosecute that aspect of her suit. While Kim's interests in the constitutionality of Revised CCSD Reg. 5131 going forward have ended, any claim for damages that she may have experienced prior to her departure would continue to be a valid claim. However, in the face of Defendants' Motion (that this Court had signaled it would treat as one for Summary Judgment), the continuity of any claim for damages arising prior to Kim's departure must be supported by admissible evidence, else it is in jeopardy. The Court will address that subject, infra.

Accordingly, the Court finds the requirements of constitutional standing are met, given that the Jacobs Plaintiffs have brought suit against a requirement that is both a threatened and actual distinct and palpable injury to Kim, there is a traceable causal connection between the injury and the constitutionality of the law and Defendants' action, and the requested relief will redress or prevent that injury. Moreover, the Court finds without difficulty that the Jacobs Plaintiffs have prudential standing, given that Plaintiffs assert their own rights and allege an interest that is within the zone of interest protected/regulated by the Nevada law at issue.

## IV. Plaintiffs' Freedom of Expression/Free Exercise of Religion Claims [1]

**A. Preliminary Freedom of Expression Considerations.** In considering

---

1. The Nevada Supreme Court has indicated that the Nevada Constitution's corollary to the First Amendment, Article 1 Section 9, is coextensive with the First Amendment to the United States Constitution. *See S.O.C., Inc. v. Mirage Casino–Hotel,* 117 Nev. 403, 23 P.2d 243, 250–51 (2001). Accordingly, all of the Court's subsequent discussion respecting the

Plaintiffs' challenge to NRS 392.458 and CCSD Reg. 5131 and assertion that the Defendants' conduct was unconstitutional, the Court must first determine: (1) whether a student's choice of attire may constitute sufficiently expressive conduct such that it may be fairly considered "speech" and within the ambit of First Amendment protection; (2) whether the student Plaintiffs' choice of attire constituted such speech; and (3) which articulated First Amendment standard should be taken by this Court's as a guide in considering the constitutionality of Nevada law and Defendants' conduct in establishing and enforcing a mandatory school uniform. The Court proceeds to those inquiries.

■ **1. May a student's choice of attire constitute "speech" under the First Amendment?** Prior to considering what speech standard should be applied against a mandatory school uniform requirement, the Court first considers whether student attire may properly be considered "speech," thereby qualifying for protection under the First Amendment.

The First Amendment reads, in its entirety, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Supreme Court has found that the First Amendment is applicable to the States by incorporation under the Fourteenth Amendment. *Employment Div., Oregon Dep't of Human Resources v. Smith,* 494 U.S. 872, 876–77, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In relation to expression, the First Amendment specifically addresses only speech. However, the Supreme Court has found that conduct, when

mixed with elements of expression, also implicates the First Amendment's protection, though action/regulation that infringes on such expression is to be evaluated on a different basis than that alleged to infringe upon purer forms of expression. *See generally Cox v. Louisiana,* 379 U.S. 559, 563–64, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (distinguishing between protection afforded the mixed expression of picketing and parading and that afforded to the pure expression of newspaper editorials, editorial cartoons, and telegrams). As the Supreme Court has summarized,

> The First Amendment literally forbids the abridgment only of "speech," but we have long recognized that its protection does not end at the spoken or written word. While we have rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," *United States v. O'Brien,* [391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ], we have acknowledged that conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," [*Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) ]. In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." [*Spence,* 418 U.S. at 410–411, 94 S.Ct. 2727.]

First Amendment's strictures in relation to law allowing for/establishing a mandatory school uniform requirement in public schools

in Clark County is intended to apply to Plaintiffs' Nevada Constitution-based allegations as well.

*Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). "[T]he nature of appellant's activity, combined with the factual context and environment in which it was undertaken" are relevant considerations in determining whether the communicative aspects of conduct amount to speech. *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673.

After applying the considerations outlined by the Supreme Court above, this Court has no difficulty in concluding that student attire may indeed constitute speech on many levels, and thereby implicate First Amendment rights. While the decision to wear one piece of clothing over another may be no more than a matter of taste, the choices that students make in dressing themselves can be—and often are—guided by much more nuanced and complex considerations than simple aesthetics. Clothing may constitute pure speech when it bears printed language. *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (shirt bearing message derogatory of the military draft considered political speech). Clothing may also be meant to demonstrate group affiliation by indicating ethnicity (e.g., a culture's traditional dress), social class (e.g., brand name or custom clothing), religion (e.g., bearing cross, star of David), political affiliation (e.g., bearing elephant, donkey); or other symbols signifying group or viewpoint association (e.g., a band's concert shirt, gangland paraphernalia, or shirt featuring a marijuana leaf). Student clothing may be used to challenge authority, assert sexuality, or defy a variety of stereotypes. Conversely, student clothing may be intended to demonstrate acquiescence in the prevailing order, to stifle sexuality, or to conform with prevailing stereotypes. While various intentions behind the choices

driving what students wear may be diverse and often conflicting, the Supreme Court has held that they may constitute "speech" so long as the choice of clothing demonstrates an intent to convey a particularized message and the likelihood is great that the message will be understood by those who view the clothing. *See Johnson,* 491 U.S. at 404, 109 S.Ct. 2533 (citing *Spence,* 418 U.S. at 410–411, 94 S.Ct. 2727). Accordingly, the Court finds that a student's selection of clothing may constitute speech impinging on First Amendment protection under the parameters defined by the Supreme Court.

■ **2. Did the student Plaintiffs' choice of attire constitute "speech" under the First Amendment?** Having determined that student clothing may constitute "speech" under the First Amendment, the Court turns its consideration to whether the student clothing at issue in this case possessed sufficient communicative elements to implicate the First Amendment.

The undisputed facts indicate that Kim Jacobs wore shirts bearing religious messages, that Kim intended to convey her religious affiliation and/or beliefs through wearing those shirts, and that Liberty High's enforcement of its Campus Wardrobe policy precluded her wearing of such shirts. Given the *Cohen* Court's conclusion that wearing clothing bearing a printed message constitutes speech (*see Cohen,* 403 U.S. 15, 91 S.Ct. 1780), Kim's choice of attire would seem clearly to indicate an attempt to convey a particularized message with a high likelihood that the message would be understood by those who view the clothing, regardless of whether wearing that clothing was a necessary aspect of her religious beliefs.[2] Consequently, the Court finds that Kim's clothing

---

**2.** The Court will address the argument that the school's dress code violates Plaintiffs'

Free Exercise of Religion rights, infra.

constitutes speech within the ambit of First Amendment protection.

The Dresser Plaintiffs allege that Shane Dresser refused to wear the Campus Wardrobe because the wearing of a uniform is contrary to his religious beliefs. Shane Dresser's mother, Wendy, requested a religious exemption to the uniform requirement, and the School denied that request. Wendy subsequently provided a letter from the pastor of her church supporting that assertion, but the School continued to deny her requested exemption. Regardless of whether Shane or Wendy Dresser's religion actually forbad the wearing of a school uniform—and taking as true Plaintiffs' substantiated allegations for purposes of evaluating Defendants' Motion—this Court finds sufficient evidence to indicate that Shane Dresser's refusal to submit to his school's uniform requirement was imbued with sufficient communicative elements that the refusal constituted speech falling under the First Amendment's protection. In making that determination, the Court takes as its guide the Supreme Court's decision in *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), which found a New Hampshire law making it a crime to obscure the words "Live Free or Die" on the state's license plates an unconstitutional infringement of the First Amendment. In reaching that conclusion, the Court noted that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all," and further stated that the "right to speak and right to refrain from speaking are complementary components" of the First Amendment's protection. *Id.* at 714, 97 S.Ct. 1428. The *Wooley* Court went on to find that the "First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster ... an idea they find morally objectionable." *Id.*

at 715, 97 S.Ct. 1428. The question of whether the school's attempt to restrict Shane Dresser's "speech" (or lack thereof) in the classroom passes constitutional muster will be addressed in the next section; however, the Court views the Supreme Court's decision in *Wooley* to establish that Shane Dresser's refusal to comply with the uniform requirement on the basis of religious and moral objection constitutes, at the least, expressive speech within the ambit of the First Amendment.

After reviewing the record, the Court finds no averment by Dwight Terry that he intended to convey a particularized message in refusing to comply with the uniform requirement. In Plaintiffs' Amended Complaint, Plaintiffs aver that "On at least five occasions during the Fall 2004 semester, Plaintiff Dwight Terry Jr. was sent to the principal's office for the remainder of the school day for failure to wear the required school uniform." At ¶ 23. Both Plaintiffs' Original Opposition (# 19) and Supplemental Opposition/Counter Motion for Partial Summary Judgment (## 28,29) repeat the exact same language without adding any indication that Dwight intended to convey any message through his choice of clothing, or indeed without making any other reference to Dwight Terry. Because Plaintiffs have failed to advance any argument or evidence indicating that Dwight Terry intended to communicate a particularized message through his choice of clothing in the face of a Motion for Summary Judgment—a necessary antecedent to finding that expressive conduct rises to the level of speech—this Court finds as a matter of law that Dwight Terry's refusal to submit to a school uniform policy does not evoke First Amendment protection.

After reviewing the record, the Court finds no averment by Whitney Rose, John Doe I, or John Doe II that they intended

to convey a particularized message in refusing to comply with the uniform requirement. Indeed, there is no allegation or evidence anywhere in the record concerning whether these students' ever even attempted to wear clothing not in harmony with the uniform requirement, whether having done so these students were ever disciplined in any manner for refusing to abide by the uniform requirement, or indicating that these students would have intended some communicative message in their choice of clothing; rather, all that Plaintiffs aver is that Garside Elementary adopted the uniform policy without the requisite parental support, and that the mothers of John Does I and II allege procedural error in the adoption of Glen Taylor Elementary's uniform requirement. These assertions will be addressed elsewhere, infra. Because Plaintiffs have failed to advance any argument or evidence indicating that these students intended to communicate a particularized message through their choice of clothing in the face of the Summary Judgment standard, this Court finds as a matter of law that these students' (alleged) objections to a school uniform policy do not evoke First Amendment protection.[3]

■ **3. Applicable First Amendment standard.** Having found that a student's choice of attire may implicate the First Amendment, and that Kim Jacobs and Shane Dresser's choice of attire did implicate the First Amendment, the Court proceeds to consider which First Amendment

principles should govern the consideration of the constitutionality of the Nevada law and the actions of the individually-named Defendants. Plaintiffs assert that the Ninth Circuit's decision in *Chandler v. McMinnville School District,* 978 F.2d 524 (9th Cir.1992), requires the Court to analyze the Nevada laws and Defendants' conduct under the Supreme Court's decision in *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and that application of *Tinker* would proscribe the Nevada law and regulation and the conduct of Defendants. Defendants argue that the law is content neutral, and that the appropriate analysis is therefore under either 1) intermediate scrutiny as defined in the Supreme Court's decision in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) and the Fifth Circuit's application of *O'Brien* to dress codes, or 2) a non-public forum analysis, as employed in *Phoenix Elementary School District v. Green,* 189 Ariz. 476, 943 P.2d 836 (1997).

■ The Court begins its consideration by noting that, while students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker,* 393 U.S. at 506, 89 S.Ct. 733, students' First Amendment rights are not "automatically coextensive with the rights of adults in other settings," *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). Specifically, a school "need not

---

**3.** The Court briefly notes that it will entirely disregard Plaintiff Lona Finley's affidavit-based allegation that her unidentified male child and his friends wore buttons bearing the message "say no to uniforms" to school, and that while at school an Assistant Principal told her child and his friends to remove the buttons because they were safety hazards and violated the mandatory school uniform policy. Such allegations are entirely absent from either the Original or Amended Complaint, and

are mentioned only briefly in Plaintiffs' filings, specifically at page 6:19–21 in Plaintiffs' Opposition/Cross Motion for Partial Summary Judgment, in the affidavit of Lona Finley attached as an exhibit to the same Opposition/Cross Motion, and in Plaintiffs' Reply in support of Plaintiffs' Motion for Partial Summary Judgment. That brief treatment is insufficient to assert a cause of action meriting further discussion by the Court.

tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school.'" *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting *Fraser*, 478 U.S. at 685, 106 S.Ct. 3159). " 'The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,' and not with the federal courts." *LaVine v. Blaine School Dist.*, 257 F.3d 981, 988 (9th Cir.2001) (quoting *Hazelwood*, 484 U.S. at 267, 108 S.Ct. 562).

Plaintiffs assert that the definitive case addressing student speech in the Ninth Circuit is *Chandler v. McMinnville School Dist.*, 978 F.2d 524 (1992). In *Chandler*, an Oregon high school's teachers went on strike, and two of the striking teachers' student sons wore buttons on their clothing to school one day bearing messages critical of the replacement teachers brought in by the school district during the strike. Two of these buttons displayed the phrases "I'm not listening scab" and "Do scabs bleed?" The two students distributed similar buttons to some of their classmates, and one of the students tried to take a picture of one of the temporary administrators. This temporary administrator objected, and accompanied both students to the vice principal's office, where the vice principal told the boys to remove the buttons because the buttons were "disruptive." The students objected, the vice president insisted, the students refused, and the students were suspended for the remainder of the day. On the following day, the students wore other buttons that were also critical of the replacement teacher policy (one that read "Scabs" with a line drawn through it and another with the phrase "Scab we will never forget") and urged an end to the strike. That afternoon, the vice principal told one of the students to remove the buttons; anticipat-

ing further disciplinary action if he refused, the student complied with the request. Both students subsequently filed suit against the school district, alleging that their First Amendment rights to Free Expression had been violated by the vice principal's actions.

In evaluating their claims, the *Chandler* Panel found that the students' button-based expression was "akin to pure speech," and reviewed three Supreme Court opinions in which the Court considered the level of scrutiny that ought to be applied to the regulation of student speech. In *Tinker*, Junior High School students were suspended for wearing black armbands intended to communicate their disapproval of the United States' activities in Vietnam. *Tinker*, 393 U.S. 503, 89 S.Ct. 733. The *Tinker* Court ultimately found that the students' conduct was "silent, passive expression of opinion, unaccompanied by any disorder or disturbance," and that such disturbance was unlikely. *Id.* at 508, 89 S.Ct. 733. The *Tinker* Court then concluded that "where there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained." *Id.* at 509, 89 S.Ct. 733.

The student expression at issue in *Fraser* consisted of a speech given at a high school assembly that contained sexual innuendo and metaphor. *Fraser*, 478 U.S. 675, 106 S.Ct. 3159. In response, the School Board suspended the student for three days and barred him from the opportunity to speak at his graduation. On those facts, the *Fraser* Court held that such school action was

entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech. Unlike the sanctions im-

posed on the students wearing armbands in *Tinker,* the penalties imposed in this case were unrelated to any political viewpoint. The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as [Fraser's] would undermine the school's basic educational mission.... Accordingly, it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the "fundamental values" of public school education.

*Id.* at 685–86, 106 S.Ct. 3159.

Finally, the student speech at issue in *Hazelwood* consisted of two pages of an issue of a school newspaper edited and written by school students that were forcibly deleted by school administrators. 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592. The principal caused the pages to be deleted because they consisted of an article addressing students' experiences with pregnancy, and another article describing the impact of divorce on students at the school, and the principal determined that such topics were inappropriate content for the student paper. Under those facts, the *Hazelwood* Court found *Tinker* inapposite, noting that the *Tinker* standard was too restrictive when determining "when a school may refuse to lend its name and resources to the dissemination of student expression." *Id.* at 261, 108 S.Ct. 562. The Court then validated discretionary editorial control by school officials over the school-sponsored newspaper "so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.*

After reviewing those three decisions, the *Chandler* Panel concluded that all student speech may be classified into one of three categories: (1) vulgar, lewd, obscene, and plainly offensive speech (governed by *Fraser* ); (2) school-sponsored speech (governed by *Hazelwood* ); and (3) all other speech (governed by *Tinker* ). *Chandler,* 978 F.2d at 529. Under that rubric, the *Chandler* Panel found the students' button-based expression was not vulgar, lewd, obscene, or plainly offensive, and also that the students' buttons could not be reasonably construed as school-sponsored speech; accordingly, the speech fell into the "all other speech" category, governed by *Tinker.* In applying *Tinker* to the facts at hand, the *Chandler* Panel found that the school district had failed to establish that the wearing of the buttons would substantially disrupt or materially interfere with school activities, and, consequently, the school district's actions impermissibly infringed on the students' First Amendment right to Free Expression.

Nine years later, another Ninth Circuit panel applied the *Chandler* Court's rubric in *LaVine v. Blaine School District,* 257 F.3d 981 (9th Cir.2001) in finding, pursuant to *Tinker,* that a school district's actions in expelling a student after he submitted a violent poem to one of his teachers was warranted because the poem fell under the *Tinker*-governed "all other speech" category and constituted information that might reasonably have led authorities to forecast substantial disruption of or material interference with school activities.

Plaintiffs assert that, in conformity with the *Chandler* Panel's rubric—and the *LaVine* Panel's continuing endorsement of that rubric—this Court must find that CCSD's mandatory dress code is "other speech" and falls under *Tinker,* that CCSD has failed to demonstrate that non-mandatory dress codes would materially and substantially interfere with the requirements of appropriate discipline in the operation of the schools, and that NRS 392.458 (authorizing mandatory dress codes) and CCSD

Reg. 5131 (implementing that authorization) are therefore unconstitutional.

After considering the *Chandler* Panel's opinion and the Supreme Court precedents upon which it is predicated, this Court finds that the issue of a mandatory dress code falls outside those categories of speech contemplated in *Chandler.* Though that conclusion may appear to be a non sequitur at first blush, given the "all other speech" category established by the *Chandler* Panel, that conclusion is necessary and implicit in assigning the *Tinker* standard to such speech. In *Tinker,* Justice Fortas began his majority opinion discussion of the requisites of the First Amendment by identifying what the Court was NOT considering in applying the First Amendment to student Vietnam War protests. He wrote:

> The problem posed by the present case does not relate to the regulation of the length of skirts or the type of clothing, to hair style, or deportment. Cf. *Ferrell v. Dallas Independent School District,* 392 F.2d 697 (5th Cir.1968); *Pugsley v. Sellmeyer,* 158 Ark. 247, 250 S.W. 538, 30 A.L.R. 1212 (1923). It does not concern aggressive, disruptive action or even group demonstrations. Our problem involves direct, primary First Amendment rights akin to "pure speech."

*Tinker,* 393 U.S. at 507–08, 89 S.Ct. 733.

This Court finds that a mandatory student dress code is either that type of "speech" regulation disclaimed by the *Tinker* Court when referencing "type of clothing" regulation, or that such a code is within the same genre of appearance and conduct "speech" regulation which the *Tinker* Court exempts from its ruling. This Court opines that such a conclusion is straight-forward and uncomplicated by more common pitfalls of the lexicon in which lawyers and laypersons often delve and occasionally founder, though "types of clothing" be susceptible of many meanings; the phrase may refer to the color, quality (e.g., ripped, frayed, transparent), quantity (e.g., the length of shorts or skirts), state (e.g., soiled, stained, unbuttoned, untied), style (e.g., casual or formal), origin (e.g., brand name, logo), or communicative intent (e.g., bearing a message or symbol) of the clothing. Each of these meanings describe physical attributes of that material in which one may choose to vest oneself. Given that commonality and the absence of any differentiating factor in the *Tinker* reference to "types of clothing," the Court finds no basis, cause, or occasion to elevate one of these definitions above the others identified in considering what the *Tinker* Court intended by referring to "types of clothing," and will treat the mandatory dress code at issue as a regulation respecting "type of clothing" contemplated in *Tinker.*

In making that determination, this Court finds that the *Tinker*-disclaimed regulation of appearance and conduct may constitute "speech," thereby implicating First Amendment protection, and that the *Tinker* Court intended to indicate that possibility. Directly following the *Tinker* Court's articulation of the disclaimed "speech," the *Tinker* Court cites "Cf." to *Ferrell v. Dallas Independent School District,* 392 F.2d 697 (5th Cir.1968) and *Pugsley v. Sellmeyer,* 158 Ark. 247, 250 S.W. 538, 30 A.L.R. 1212 (1923). In *Ferrell,* the Fifth Circuit held, inter alia, that a school's refusal to enroll students with hair longer than that permitted by the school's regulation did not violate the First Amendment right to Freedom of Expression. In so ruling, the *Ferrell* panel stated that, while the length of the students' hair constituted symbolic speech, the school's interest in maintaining an effective and efficient school system through governing student appearance and comportment constituted a sufficiently compelling reason

for the state to infringe on the students' intended expression. *Ferrell,* 392 F.2d at 702–03 (stating that "The Constitution does not establish an absolute right to free expression of ideas.... The constitutional right to free exercise of speech, press, assembly, and religion may be infringed by the state if there are compelling reasons to do so."). The *Tinker* Court's reference to *Ferrell* appears to this Court to indicate that the *Tinker* Court would place a student's choice of hair style within that genre of "speech" consisting of conduct mixed with elements of expression contemplated by the Court in *Johnson,* 491 U.S. at 404, 109 S.Ct. 2533, and elsewhere. If that surmise is correct, the *Tinker* Court would appear to likewise indicate it would consider that the other mentioned aspects of appearance and conduct—a student's length of skirt, type of clothing, and deportment—may constitute mixed speech as well.

In *Pugsley,* the Arkansas Supreme Court found that a school district's proscription of immodest dress and the wearing of cosmetics by female students (ostensibly to maintain student discipline) did not constitute abuse of the district's discretion or violate the law. While the *Pugsley* Court did not specifically consider the dress code at issue within the context of a First Amendment challenge, its discussion of the school board's actions—and the *Tinker* Court's citation to that discussion—is instructive in considering what approach is appropriate in applying the strictures of the First Amendment to a district-imposed student dress code, and in divining the type of deference that the *Tinker* Court would afford the regulation of such speech. The *Pugsley* Court first adopted a general statement concerning the state of the law, noting that because the Court will not interfere with school directors' discretion unless there is a clear abuse of that discretion, "the courts are usually disinclined to interfere with regulations adopted by school boards, and they will not consider whether the regulations are wise or expedient, but merely whether they are a reasonable exercise of the power and discretion of the board." *Pugsley,* 250 S.W. at 539 (citation omitted). The *Pugsley* Court continued:

The question, therefore, is not whether we approve this rule as one we would have made as directors of the district, nor are we required to find whether it was essential to the maintenance of discipline. On the contrary, we must uphold the rule unless we find that the directors have clearly abused their discretion, and that the rule is not one reasonably calculated to effect the purpose intended, that is, of promoting discipline in the school; and we do not so find....

Courts have other and more important functions to perform than that of hearing the complaints of disaffected pupils of the public schools against rules and regulations promulgated by the school boards for the government of the schools. The courts have this right of review, for the reasonableness of such rule is a judicial question, and the courts will not refuse to perform their functions in determining the reasonableness of such rules, when the question is presented. But, in doing so, it will be kept in mind that the directors are elected by the patrons of the schools over which they preside, and the election occurs annually. These directors are in close and intimate touch with the affairs of their respective districts, and know the conditions with which they have to deal. It will be remembered also that respect for constituted authority and obedience thereto is an essential lesson to qualify one for the duties of citizenship, and that the schoolroom is an appropriate place to teach that lesson; so that the courts hesitate to substitute their will and judg-

ment for that of the school boards which are delegated by law as the agencies to prescribe rules for the government of the public schools of the state, which are supported at the public expense.

*Id.* This Court understands the *Tinker* Court's reference to *Pugsley* to indicate the type of deference that the *Tinker* Court would afford the regulation of the disclaimed speech.

Given the subject matter of this litigation and the Court's conclusions above, a review of the *Tinker* majority's disclaimer begs consideration of the question, "how are 'regulation of the length of skirts or the type of clothing,' 'hairstyle,' or 'deportment' to be evaluated in the context of a First Amendment challenge in the Ninth Circuit?" In many (if not most) instances, these categories of "speech" will not constitute vulgar, lewd, obscene, and plainly offensive speech such that the speech is wholly inconsistent with public education's fundamental values.[4] Nor does such "speech" fall under school-sponsored speech.[5] In fact, such "speech" would appear, per *Chandler*'s tripartite classification, to fall into the "other speech" category, which *Chandler* tells us is governed by *Tinker*. Yet the *Tinker* Court specifically states that its decision is inapposite respecting the regulation of such "speech."

Thus, the Court must infer from the *Chandler* panel's reference to *Tinker*—and the *Tinker* Court's explicit disclaimer—that a fourth category of "speech" exists that must be considered separate and distinct from the *Chandler* panel's "other speech" category.

While the Court is reticent to distinguish or otherwise narrowly construe a holding of the Circuit, such a conclusion as that reached by this Court above is the only application of the *Chandler* panel's decision in that area of "speech" disclaimed by the *Tinker* Court if *Chandler* and *Tinker* are to be reconciled in light of the scheme enunciated by *Chandler*. The Court notes that its conclusion that the *Chandler* panel's reference to *Tinker* necessitates a fourth category of speech is consonant with the Ninth Circuit's decision in *King v. Saddleback Jr. College District*, 445 F.2d 932 (9th Cir.1971), a decision predating *Chandler* by some twenty years and that *Chandler* did not expressly overturn.

In *King*, the respondent students at petitioner school and junior college districts contested as unconstitutional the districts' school dress code requirements relating to length of hair. After considering the facts and law, the *King* panel found that respon-

---

**4.** Consider, e.g., the wearing of long hair and/or mustaches by boys, the wearing of short skirts by girls, a mohawk worn by either boys or girls, the silent and covert passing of love notes in class, or the humming of political anthems during the administration of an algebra exam.

**5.** While it could be said that a school's continued acquiescence in those activities mentioned in the preceding footnote could be a type of "endorsement" or sponsorship of those activities by the school, the *Hazelwood* decision is much more narrow than such a reading, and describes sponsorship where a school specifically lends its name and resources to the dissemination of student expression, as recognized by *Chandler;* in de-

scribing students wearing buttons referencing "scabs" in a teacher strike, the *Chandler* panel stated:

> The buttons expressed the personal opinion of the students wearing them, and they were displayed in a manner commonly used to convey silently an idea, message, or political opinion to the community. [citation omitted] In addition, they expressed a position on a local political issue that was diametrically opposed to the school district's decision to hire replacement teachers. Therefore, the complaint does not show that a reasonable person could have viewed the buttons as bearing the imprimatur of the school.

*Chandler*, 978 F.2d at 530.

dents had failed to allege a supportable claim that the length of their hair constituted symbolic speech. In reaching that conclusion, the panel stated that *Tinker* was inapposite in considering the legitimacy of the prescribed hair length restriction: "we do not believe that *Tinker,* supra, controls either of these cases since *Tinker* appears to clearly distinguish between rights akin to 'pure speech' and those school regulations having to do with personal appearance, style of clothing, or deportment." *King,* 445 F.2d at 937. After reviewing and rejecting other constitutional bases for challenging the hair-length requirement, the *King* panel concluded:

> This is not a question of preference for or against certain male hair styles or the length to which persons desire to wear their hair. This court could not care less. It is a question of the right of school authorities to develop a code of dress and conduct best conducive to the fulfillment of their responsibility to educate, and to do it without unconstitutionally infringing upon the rights of those who must live under it. We do not believe that the plaintiffs have established the existence of any substantial constitutional right which is in these two instances being infringed. We are satisfied that the school authorities have acted with consideration for the rights and feelings of their students and have enacted their codes, including the ones in question here, in the best interests of the educational process. A court might disagree with their professional judgment, but it should not take over the operation of their schools. *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

*Id.* at 940. While the *King* panel acknowledged that it made its ruling in the absence of factual allegations sufficient to indicate that student hair length was intended to constitute "symbolic speech," the overall tone and substance of the *King*

decision appear to this Court to bolster its conclusion that there exists a fourth category of speech under *Tinker,* that this category would include "speech" involving the dress, grooming, and comportment of public school students, and that the controlling standard for determining how a district may regulate such speech is to be found somewhere other than in *Tinker.* Accordingly, the Court must determine what considerations and level of review are appropriate for evaluating the regulation of speech falling under this fourth category.

After considering those decisions to have addressed this issue (and Defendants' arguments), the Court finds most persuasive the Fifth Circuit's decisions in *Canady v. Bossier Parish School Board,* 240 F.3d 437 (5th Cir.2001), and *Littlefield v. Forney Independent School Dist.,* 268 F.3d 275 (5th Cir.2001). In *Canady,* students enrolled in school districts that implemented a mandatory school uniform brought suit on the basis that such a regime violated the students' First Amendment right. After concluding that a student's choice of clothing may be "endowed with sufficient levels of intentional expression to elicit First Amendment shelter," *Id.* at 440, the *Canady* panel reviewed the three standards for student expression set forth in *Hazelwood, Fraser,* and *Tinker,* and found that the respondent board's mandatory, viewpoint-neutral uniform policy did not readily conform to any of the three standards. The *Canady* panel then considered and rejected the Ninth Circuit's decision in *Chandler* to relegate "all other speech" to a *Tinker* analysis, holding that:

> Applying the *Tinker* analysis to all other restrictions on student speech does not account for regulations that are completely viewpoint-neutral. The Supreme Court clearly thought it necessary to apply a higher standard of scrutiny to "personal expression that happens to oc-

cur on the school premises," as opposed to First Amendment activity sponsored by the school. [*Hazelwood*], 484 U.S. at 271, 108 S.Ct. 562, 98 L.Ed.2d 592. The Court also held that a lower standard should apply when school restrictions of student expression are "unrelated to any political viewpoint." *Fraser*, 478 U.S. at 685, 106 S.Ct. 3159, 92 L.Ed.2d 549. Because (1) choice of clothing is personal expression that happens to occur on the school premises and (2) the School Board's uniform policy is unrelated to any viewpoint, a level of scrutiny should apply in this case that is higher than the standard in [*Hazelwood*], but less stringent than the school official's burden in *Tinker*. Both the traditional time, place and manner analysis and the *O'Brien* test for expressive conduct satisfy this requirement. The time, place and manner analysis and the O'Brien test are virtually the same standards of scrutiny for purposes of assessing the validity of the school uniform policy. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 298, 104 S.Ct. 3065, 82 L.Ed.2d 221 . . . (1984) (comparing the time, place and manner analysis to the test outlined in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 . . . (1968)). Thus, the School Board's uniform policy will pass constitutional scrutiny if it furthers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest. *Id.* at 443.

The *Canady* panel then considered the constitutionality of the respondent school board's mandatory school uniform under the standard set forth in *O'Brien*, and concluded that: (1) improving the educational process and concerns for the health, safety, and order of public schools, as addressed by the school uniform requirement, are important and substantial government interests; (2) those interests are unrelated to the suppression of student expression and are viewpoint neutral; and (3) the school uniform-induced restriction on First Amendment activities is not more than is necessary given that students may wear what they will after school hours and students may still express their views through other mediums during the day, and are otherwise free to engage in the "personal intercommunication among students" that the *Tinker* Court indicated is a necessary aspect of an effective educational process. *See Tinker*, 393 U.S. at 512, 89 S.Ct. 733. On similar facts—and following that approach taken in *Canady*—the *Littlefield* panel reached the same conclusions and result. *See Littlefield*, 268 F.3d at 287.

After considering the *Canady* and *Littlefield* decisions and their import, the Court finds that the approach articulated by the Fifth Circuit in those two cases is consonant with and correctly synthesizes Supreme Court precedents with respect to a fourth category of speech, adequately balances the free expression rights of students against the corresponding interests of furthering the educational mission of schools, and best makes sense of and is faithful to the Ninth Circuit's pronouncements in *Chandler* and *King*. Accordingly, the Court takes *Canady* and its application of the *O'Brien* test as the Court's guide in evaluating whether NRS 392.458 and CCSD Reg. 5131 are unconstitutional, and whether the actions of Defendants have violated Plaintiffs' First Amendment rights.

■ **B. NRS 392.458 and Plaintiffs' Freedom of Expression claims.** While nearly all of Plaintiffs' assertions address either whether *any* mandatory school uniform policy may be constitutional or

whether CCSD Reg. 5131 was implemented correctly, Plaintiffs also assert that NRS 392.458 itself is an unconstitutional infringement on Plaintiffs' Freedom of Expression rights. In considering the law outlined above, the Court finds that no aspect of NRS 392.458 violates the First Amendment's prohibitions, nor is NRS 392.458 vague or overbroad in its import. The Court finds that an *O'Brien* analysis is unwarranted with respect to NRS 392.458, given that the law does not in itself create a mandatory school uniform but only provides that such a uniform requirement may be established by school districts in the State of Nevada. As the Court has concluded above, a mandatory uniform requirement may be implemented without violating the First Amendment's precepts so long as the *O'Brien* considerations are satisfied. The Court finds that NRS 392.458 accurately restates that conclusion, does not go beyond that conclusion, and is not in itself a violation of First Amendment considerations.

### C. CCSD Reg. 5131 and Plaintiffs' Freedom of Expression claims.

1. **Original or Revised?** As a preliminary matter, the Court must determine whether it is necessary to further consider the constitutionality of Original CCSD Reg. 5131, or whether the Court should consider only the constitutionality of the regulation as presently constituted in Revised CCSD Reg. 5131. The Court understands Revised CCSD Reg. 5131 to specifically nullify Original CCSD Reg. 5131, such that Original CCSD Reg. 5131 is no longer in effect. Thus, the Court must determine if Plaintiffs have alleged damages emanating from the Original CCSD Reg. 5131 that survive the effective repeal of the original regulation, or if their allegations deal only with aspects of the regulation that have survived the revision.

As is outlined in the BACKGROUND section above, the differences between the Original and Revised regulation are minimal, and are confined to 1) the removal of the previously-recognized exemption to the uniform requirement for "nationally-recognized youth organizations"; 2) the modification of the parental survey requirements; and 3) provisions for the continuity of uniform policies in schools that have previously adopted them and for exemptions, both of which applied specifically to the 2004/2005 school year.

Other than to aver that the youth organizations exemption indicates a content-specific distinction between favoring certain clothing-related "speech," Plaintiffs have never asserted that the exception for nationally-recognized youth organizations was ever invoked nor that any of Plaintiffs' alleged damages arose from this exemption. Accordingly, the Court has no qualms in determining that none of Plaintiffs' requested damages arise from this removed clause. However, some of Plaintiffs' allegations do implicate the (2) and (3) changes outlined above. Specifically, Plaintiffs aver that both the Garside Jr. High (represented by Plaintiff/student Whitney Rose and her mother, Lynn Rose) and Liberty high (represented by Kim Jacobs and her Plaintiff parents) implemented a uniform policy without the required successful parental survey. Plaintiffs further assert that there were irregularities in the parental survey process that lead to the adoption of the mandatory uniform requirement at Glen Taylor Elementary (represented by Plaintiff John Does I and II, and their mothers, Plaintiffs Lona Finley and Deanna Wright). As is outlined above, these Plaintiffs nowhere assert that any of them experienced any damages emanating from the premature/improper adoption of a mandatory uniform requirement. Plaintiffs have made no allegations that Whitney Rose, John Doe I, or John Doe II so much as attempted to wear clothing not in accord with the uniform

requirement, let alone that these students were subsequently disciplined in any fashion. Indeed, on the basis of the amended pleadings, the Court would infer that these Plaintiffs cannot assert such damages under either the Original or Revised CCSD Reg. 5131.

Further, Plaintiffs have not responded with competent (or, indeed, any) evidence to Defendants' assertion that Kim did not experience any damages as a result of her noncompliance with Liberty's uniform requirement. Defendants have buttressed that assertion with evidence indicating that Kim's record in school has not suffered and that, in fact, she may have performed better during the fall of 2004 when she was non-compliant with the uniform requirement than she did previously. In the face of such allegations and in light of the Court's indication that it would proceed under a summary judgment standard, it is incumbent upon Plaintiffs to substantiate their cause of action. They have not done so, but rather continue to argue by assertion that Kim experienced some emotional and/or educational damage, and point to this Court's language in its decision to grant a preliminary injunction in support of that argument. Plaintiffs are correct in noting that this Court has previously indicated Kim's absence from school because of non compliance with the uniform requirement may have caused her damages that are not apparent solely by referring to her scholastic record; however, it is still incumbent upon Plaintiffs to provide some evidence of that damage in the face of Defendants' Motion. While the resolution of the quantity of damages is a question of fact reserved for the jury to consider, Plaintiffs may not rest on mere allegation

that there were damages when Defendants have provided evidence to the contrary in the context of summary judgment.[6]

The Court finds that Plaintiffs have not made out a continuing claim for damages relating to the implementation, premature or otherwise, of the specific Original version of CCSD Reg. 5131. Consequently, all of Plaintiffs' issues with CCSD Reg. 5131 are amply addressed in a discussion of the constitutionality of Revised CCSD Reg. 5131.

 It seems here appropriate to the Court to (briefly) address an argument related to the parental survey change made in CCSD Reg. 5131. While Plaintiffs do not assert that there were any irregularities with the implementation of Revised CCSD Reg. 5131, Plaintiffs make much of the fact that the new methodology and requirements of Revised CCSD Reg. 5131 respecting the parental survey process are relaxed from those contemplated in the original regulation, and now require less of an endorsement and potentially less involvement to implement a mandatory uniform process. While the Court can understand why that would not please Plaintiffs, this change is completely inapposite to the litigation at hand. So long as Defendants comply with Nevada law and regulation, the constitutional issues and considerations remain the same. Beyond asserting that the implementation of a mandatory uniform requirement violates the First Amendment, Plaintiffs have proffered no legal argument to support their inference that a minimum level of parental involvement is necessary before a school administration may implement change. Accordingly, the Court will ab-

---

6. *See also Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (constitutional violations brought under 42 U.S.C. § 1983 are premised on a tort standard of liability and, consequently, the abstract value of a constitutional right may not form the basis for § 1983 damages absent proof of actual injury).

breviate any further discussion of this facet of Plaintiffs' unhappiness with the mandatory uniform requirement.

■ **2. Is Revised CCSD Reg. 5131 content neutral?** Plaintiffs assert that because Revised CCSD Reg. 5131's uniform description permits clothing bearing the individual school's logo, the regulation is not content neutral, but rather content specific in that it allows speech identifying (and Plaintiffs assert "promoting") the individual school. Accordingly, aver Plaintiffs, Revised CCSD Reg. 5131 should not be evaluated under *O'Brien,* but rather under the *Tinker* Court's strict scrutiny standard for content-specific regulation of speech.

After reviewing Revised CCSD Reg. 5131 and the parties' arguments and submissions, the Court finds as a matter of law that Revised CCSD Reg. 5131 is content neutral. Assuming, arguendo, that wearing a piece of clothing bearing the school logo constitutes "speech," the appearance of a school logo on clothing approved under a mandatory uniform policy does not implicitly "promote" a message favorable to the school, as Plaintiffs assert. While a school logo does indicate likely attendance at a school, that association is shared by all students at a given school, and does not convey more speech than that the student wearing the logo-emblazoned clothing is most likely affiliated with the school. Such identification, in tandem with that uniform color scheme adopted by a school implementing the uniform requirement, reinforces such a school's professed interest in strengthening safety at school by further aiding school administrators to quickly identify who is and who is not a student on their campus. Accordingly, the Court finds that the fact that Revised CCSD Reg. 5131 allows that an approved uniform may include the school's logo is not a viewpoint specific regulation of speech, and that Revised CCSD Reg. 5131 is content neutral.

■ **3. Preliminary issues relating to discretion.** In reviewing Revised CCSD Reg. 5131, the Court has found two sections that provide almost unlimited discretion to school administrators to make exceptions to the mandatory uniform requirement once it has been adopted at a school, and these sections give the Court pause. Section V. (entitled "Special Occasions") provides that "The principal shall retain the authority to grant exceptions for designated spirit days, special occasions, or special conditions." Section VI.D.4.a. provides that "No student shall be considered noncompliant with the policy in the following instances: a. When wearing standard student attire violates a student's/parent's religion." In both sections, school administrators are given unfettered discretion to determine whether and under what circumstances individuals should be required to wear the mandatory uniform. Plaintiffs challenge, inter alia, the constitutionality of these grants of discretion.

In considering the constitutionality of such broad discretion, the Court takes as its guide that line of precedents addressing instances where government officials are endowed with unbridled discretion to regulate in the First Amendment arena. *See, e.g., City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). In such scenarios (usually involving municipal licensure requirements), the Supreme Court has consistently held that legal provision subjecting the exercise of the Freedom of Expression to a prior granting of permission that is "without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d

162. The Court examines each section in light of that precedent.

Section VI.D.4.a. vests unfettered discretion in a school's administration to determine whether wearing the mandatory uniform violates a student's/parent's religion. By way of example, the Court notes that in considering whether the mandatory uniform requirement violates a students'/parent's religious beliefs, a school administrator may attempt to determine whether a given belief is or is not a valid religion, as well as whether a religious belief that is allegedly in conflict with the uniform exception is truly held by the student/parent asserting the exemption. While school administrators may make the latter determination without running afoul of the Free Exercise of Religion rights inherent in the First Amendment, *see Littlefield*, 268 F.3d at 275, any consideration of the first determination is clearly proscribed by the First Amendment. Revised CCSD Reg. 5131 does not indicate ANY factors that are to be considered nor process or procedure that are to be implemented in determining whether a religious exemption should issue for a student. The Court finds that, in the absence of such definite and delineated considerations and procedures, the risk is great that impermissible consideration or caprice may enter into a determination of whether a religious exemption should issue, and that such impermissible consideration or caprice may lead to selective exemption that would have the effect of favoring certain religions over others. Such potentially viewpoint-specific determination of what expression is acceptable is the very pith of those concerns driving prior restraint jurisprudence. Further, the Section as presently constituted permits a violation in the application without specifying any method of recourse or appeal from the error, effectively insulating a highly discretionary act from all review. Consequently, the Court will strike VI.D.4.a. from Revised CCSD Reg. 5131 as an unconstitutional prior restraint on speech. While a religious objection-based exemption to the uniform requirement may be permissible, the complete lack of structure in the religious exemption presently contemplated by Revised CCSD Reg. 5131 vitiates that provision in the present regulation.[7]

■ On similar grounds, the Court will also strike section V. from Revised CCSD Reg. 5131 as an unconstitutional prior restraint on speech. Section V. contemplates unlimited exception to the mandatory uniform requirement without insuring that such exceptions would not be viewpoint specific. Indeed, the Court is unable to imagine an exception that would not be viewpoint specific, given that the broad array of clothing options contemplated under approved uniform clothing would seemingly meet every possible meteorological condition confronting students in Clark County. Accordingly, the Court will strike section V. from Revised CCSD Reg. 5131 as an unconstitutional prior restraint on speech.

■ **4. Application of the *O'Brien* analysis to Revised CCSD Reg. 5131.** Having found that *Chandler* and *Tinker* implicitly contemplate a fourth category of speech, that Revised CCSD Reg. 5131 is content neutral, and that the appropriate considerations in evaluating the constitutionality of a content neutral regula-

7. Mindful that CCSD will look to this opinion in considering its options following the termination of this suit, the Court wishes to explicitly note as dicta the Court's conclusion that it is possible for CCSD to amend CCSD Reg. 5131 to include a valid religious exemption to the dress code, so long as that amended exemption takes into account those constitutional and administrative strictures outlined above.

tion on school speech are those outlined in *O'Brien*, the Court turns to the *O'Brien* Court's three-prong assessment: the mandatory uniform policy established in Revised CCSD Reg. 5131 will pass constitutional scrutiny if 1) it furthers an important or substantial government interest; 2) if it is unrelated to the suppression of student expression; and 3) if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest.

Defendants assert that the purposes driving Revised CCSD Reg. 5131's contemplated mandatory uniform requirement are to improve the educational process in individual schools through increasing student achievement, promoting safety, and enhancing a positive school climate. There can be little doubt that furthering and improving the educational process in Nevada schools constitutes an important or substantial government interest,[8] and Plaintiffs do not challenge that conclusion. Accordingly, the relevant question is whether Defendants' avowed interest is its true interest in allowing for the adoption of a mandatory uniform policy, and/or whether a mandatory school uniform policy does in fact further that interest. Defendants assert that the mandatory uniform policy contemplated in CCSD Reg. 5131 was intended to and does improve the education-

al process at those schools were it has been implemented, and Defendants have buttressed those assertions with affidavits from the school principal Defendants and CCSD administrators who assert that, based on their several years of administrative experience and on the uniform requirement's anecdotal results to date where they have been applied, the mandatory uniform requirement is effective in advancing those legitimate pedagogical purposes. Plaintiffs have not challenged this showing, but rather have remained largely silent on the issue of whether the mandatory uniform policy envisioned in Revised CCSD Reg. 5131 actually furthers an important or substantial government interest, though Plaintiffs refer to the pedagogical purposes as "laudable."[9] Plaintiffs have instead focused their efforts almost exclusively on advancing arguments that implicate the second and third factors of the *O'Brien* analysis. Given that silence, and given the Plaintiffs' affidavits in support of their assertions, the Court finds the first prong of the *O'Brien* analysis met.

The Court finds that Revised CCSD Reg. 5131 meets the requirement of the *O'Brien* Court's second prong. The avowed governmental interest behind Revised CCSD Reg. 5131 is to improve the educational process in Clark County

---

**8.** *See Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("education is perhaps the most important function of state and local governments").

**9.** Plaintiffs have elsewhere argued briefly and by assertion only that Defendants have not provided sufficient evidence of the need for such a uniform to satisfy a secondary effects analysis. Given the Court's finding, supra, that Revised CCSD Reg. 5131's allowance of clothing bearing the school's logo as acceptable under the mandatory uniform does not transform the otherwise content neutral regulation into a content-specific regulation, the Court will not consider a secondary effects

analysis; consequently, Plaintiffs' arguments on that point are moot. Assuming, arguendo, that these secondary effects analysis arguments might be relevant in also addressing the *O'Brien* Court's first factor, Plaintiffs' objections are unsupported, and at any rate do not challenge the Defendants' substantiated assertions that implementation of the uniform requirement does and will continue to further the important and substantial government interest of improving the educational process by increasing student achievement, promoting safety, and enhancing a positive school climate. Accordingly, the Court will discount them entirely.

schools that elect to implement a mandatory dress code; that interest is not related to the suppression of student expression. Plaintiffs have not in any way established, through competent evidence or otherwise, that the school's real interest in implementing a mandatory dress code has as its object the suppression of speech; rather, Plaintiffs assert that regardless of the interest behind CCSD Reg. 5131, "requiring all students to wear a particular uniform amounts to compelled speech promoting the particular message intended by school officials." However, such an argument does not address Clark County's governmental interest in enacting Revised CCSD Reg. 5131, the question that the *O'Brien* standard would ask in evaluating whether a government is justified in imposing incidental limitations on First Amendment freedoms associated with expressive conduct. Given the affidavits that Defendants have submitted in support of their assertions and Plaintiffs' failure to rebut in any way that evidence, the Court finds that Defendants have established the second prong of the *O'Brien* analysis.

Finally, the Court finds that Revised CCSD Reg. 5131 does not impose greater incidental restrictions on a student's ability to communicate than are necessary. While Revised CCSD Reg. 5131 limits a student's clothing options, the regulation does allow for a range of clothing and color options.[10] Further, students may continue to express themselves through other and traditional methods of communication throughout the school day; only their ability to communicate through their choice of clothing is incidentally restricted. Finally, Revised CCSD Reg. 5131 provides that the uniform requirement applies only during the regular academic day or at school-approved functions; students are free to wear what they will after school hours and elsewhere.

After evaluating Revised CCSD Reg. 5131 in light of the O'Brien Court's factors, the Court finds that Revised CCSD Reg. 5131 does not infringe on Plaintiffs' Freedom of Expression, and that Defendants are entitled to Summary Judgment against those claims.

**D. Evaluation of Plaintiffs' Free Exercise of Religion claims.** Having determined that the mandatory uniform requirement authorized by NRS 392.458 and established under CCSD Reg. 5131 does not impinge on the First Amendment's Freedom of Expression rights, the Court turns to Plaintiffs' Free Exercise of Religion-based allegations. The Dresser and Jacobs Plaintiffs assert that the mandatory school uniform authorized by NRS 392.458 and established under CCSD Reg. 5131 violates their respective religious beliefs, and their First Amendment rights thereby. Specifically, the Jacobs Plaintiffs assert that the school's preclusion of Kim Jacobs from wearing shirts bearing religious messages associated with her faith violates her Free Exercise of Religion, and the Dresser Plaintiffs assert that it is contrary to the Dresser's religion to wear any type of uniform at all, and hence the uniform requirement infringes upon the Dressers' Free Exercise of Religion.

 As noted above, the First Amendment to the constitution proscribes Congress from making any law respecting an establishment of religion, or prohibiting the free exercise of religion. The Su-

---

**10.** *Cf. King v. Saddleback Jr. College Dist.,* 445 F.2d 932, 937 (9th Cir.1971) (distinguishing between Tinker's "absolute" proscription on armbands and a school's mandatory hair length restrictions, and finding a student's expressive prerogatives were adequate within the restrictions where that student could wear "his hair at any length between a short hair cut and a long one, limited only so that the hair did not fall below the eyes in front, nor cover the ears, nor extend below the collar in back").

preme Court has found that the First Amendment is applicable to the States by incorporation of the Fourteenth Amendment. *Employment Div., Oregon Dep't of Human Resources v. Smith*, 494 U.S. 872, 876–77, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In considering the exigencies of the Free Exercise rights found in the First Amendment, the Supreme Court has applied the rational basis test and held that a rationally based, neutral law of general application may prohibit conduct that is prescribed by an individual's religion without running afoul of the First Amendment, and that such a law need not be supported by a compelling governmental interest even though it has the incidental effect of burdening a given religion. *Id.* at 883–84, 110 S.Ct. 1595; *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1030–31 (9th Cir.2004).

██ Here, Defendants have asserted (and supported with affidavits) that the mandatory uniform requirement contemplated in NRS 392.458 and CCSD Reg. 5131 is rationally based on increasing student achievement, promoting safety, and enhancing a positive school environment. Defendants further aver that the requirements of NRS 392.458 and CCSD Reg. 5131 are neutral laws of general applicability on their face, and so they would appear; these laws do not contemplate applying the mandatory uniform policy selectively to certain individuals on the basis of their religion or any other distinguishing factor. Plaintiffs do not argue otherwise (though the Plaintiffs take issue generally with any regulation of religious expression and specifically the school's application of the religious exemption). Thus, pursuant to *Smith* and *San Jose Christian College*, the school uniform policy may be enforced without violating the Free Exercise of Religion, and the precedents do not support a contrary assertion that the uniform requirement runs afoul of the First Amendment's requirements.[11]

The Dresser and Jacobs Plaintiffs also asserts that Shane and Kim's claims may be characterized as hybrid rights claims (i.e., a Free Exercise of Religion claim coupled with a Freedom of Expression claim), and accordingly that the school uniform requirement must survive strict scrutiny. *See Smith*, 494 U.S. at 881–82, 110 S.Ct. 1595; *San Jose Christian College*, 360 F.3d at 1031. However, in order to assert a viable hybrid rights claim, "a free exercise plaintiff must make out a 'colorable claim' that a companion right has been violated—that is, a 'fair probability' or a 'likelihood,' but not a certitude, of success on the merits." *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir.1999) (quoting *Thomas v. Anchorage Equal Rights Com'n*, 165 F.3d 692, 703, 707 (1999)). The Court has found, supra, that Plaintiffs do not have a viable Freedom of Expression claim. Further, the Court will find, infra, that Plaintiffs have not established a viable Fourteenth Amendment claim. Those determinations negate the Dresser and Jacobs Plaintiffs' assertion that they have set forth a valid hybrid rights claim that would require this Court to examine the mandatory uniform requirement under a strict scrutiny standard.

To the extent that the Dresser Plaintiffs assert that the school may enforce the religious exception in CCSD Reg. 5131

---

**11.** Accordingly, the Court will not address the Plaintiffs' utter failure to offer competent evidence that wearing clothing bearing an LDS message is an essential aspect of Kim Jacobs' religious beliefs or that not wearing a uniform is an essential aspect of Shane Dresser's faith (be that Northern Baptist, as professed, or a Texas-based Pentecostal religion, as indicated by the unsigned, undated letter from the Dressers' purported pastor included in Plaintiffs' Errata).

capriciously, the Court has stricken the religious exemption as a prior restraint on speech. That determination ends the Dresser Plaintiffs' suit for infringement on their Free Exercise of Religion claim unless the Dresser Plaintiffs have alleged any claims that are not mooted by this Court's decision to strike the exemption. In their Supplemental Opposition/Cross Motion for Partial Summary Judgment, the Dresser Plaintiffs aver that one of their children has received numerous citations as a result of capricious applications of the religious exemption and experienced associated damages; however, that assertion is in conjunction with an unidentified child attending Walter Long Elementary who is not a party to this suit. Plaintiffs are identified in this complaint only by their association to Shane Dresser and in connection with his efforts to obtain a religious exemption at Bridger Middle School. None of the Dresser Plaintiffs' allegations respecting a child attending Walter Long Elementary are anywhere to be found in the Amended Complaint. Consequently, the Court will disregard the Dresser Plaintiffs' assertions respecting a non-party who is not mentioned, explicitly or implicitly, in the Complaint on record.

With respect to Shane Dresser, Plaintiffs assert that: Shane Dresser refused to comply with the uniform requirement at Bridger; Wendy Dresser informed Bridger officials in the fall of 2004 that the wearing of a uniform was contrary to her religious beliefs; Bridger officials stated that her son could not attend Bridger unless he wore a uniform; Wendy Dresser then submitted a letter in March of 2005 from her pastor buttressing her assertion that wearing a uniform was contrary to the Dressers' religious belief; and the Principal of Bridger is presently considering the letter and Wendy Dresser's renewed petition to apply the exemption. Under those facts as alleged, the Dresser Plaintiffs' claims respecting the violation of their Free Exercise of Religion rights do not survive the striking of the religious exemption because no damages have been asserted. The Dresser Plaintiffs have not so much as alleged that Shane Dresser suffered any negative effect resulting from Defendants' capricious application of CCSD Reg. 5131's religious exemption. In the face of Defendants' Motion and under the Summary Judgment standard, evidentiary support indicating such damages is necessary for the claim to survive. Consequently, Defendants are entitled to Summary Judgment on the Dresser Plaintiffs' claim for violation of their Free Exercise of Religion.

## V. Plaintiffs' Equal Protection, Due Process, and Parental Rights Claims

Having disposed of the principle constitutional challenges under the First Amendment, the Court turns to the tangential argument that the statute, regulation, and action by Defendants violated the equal protection and due process clauses of the Fourteenth Amendment. In doing so, the Court notes that its Order of January 25, 2005—ordering the parties to supplement their filings—directed the parties to address the "constitutional issues presented" in those filings. Notwithstanding, neither Plaintiffs nor Defendants have addressed those constitutional issues beyond the First Amendment allegations. In spite of that silence and because the First Amendment claims are so integral to this litigation, the Court will nonetheless proceed to consider the remaining constitutional claims.

■ **A. Equal Protection.** The Fourteenth Amendment's equal protection clause provides that "No state shall … deny to any persons within its jurisdiction the equal protection of the laws." Plaintiffs have not averred that NRS392.458

and/or Revised CCSD Reg. 5131 make any distinction whatsoever between different classes of persons other than students subject to the uniform requirement and non-students that are not. Plaintiffs have not averred that Defendants implemented NRS392.458 and/or Revised CCSD Reg. 5131 in such a way that they favored certain classes of persons over other such classes (other than students subject to the uniform requirement and non-students that are not), nor that school administrators selectively enforced the mandatory dress code.[12] Thus, the Court must conclude that Plaintiffs aver that students as a class are being treated differently than non-students/adults. Such a class of students is not recognized as a suspect or otherwise specially-protected class; accordingly, the Court evaluates Plaintiffs' equal protection claims under the rational basis standard. *See Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) ("we will not overturn [a statute that does not burden a suspect class] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational").

Under rational basis review, a law will be upheld if it is "rationally related to a legitimate state interest." *Pennell v. City of San Jose*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)). As was noted above in the context of Plaintiffs' Free Exercise of Religion claim, Defendants have asserted (and supported with affidavits) that the mandatory uniform requirement contemplated in NRS 392.458 and CCSD Reg. 5131 is rationally based on improving the educational process in Clark County by increasing student achievement, promoting safety, and enhancing a positive school environment. Defendants further aver that the requirements of NRS 392.458 and CCSD Reg. 5131 are neutral laws of general applicability on their face, and so they would appear; these laws do not contemplate applying the mandatory uniform policy selectively to certain individuals on the basis of their speech or any other distinguishing factor. Plaintiffs have not asserted in any way that improving the educational process is not a legitimate state interest; that increasing student achievement, promoting safety, and enhancing a positive school environment will not improve the educational process; nor that a mandatory school uniform requirement will not lead to those improvements. By contrast, Defendants have supported assertions to the contrary with affidavits. Given those realities, the Court finds that the Nevada law and regulations respecting the uniform requirement—and Defendants' actions in implementing that law and regulation—do not offend the equal protection rights specified in the Fourteenth Amendment. Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiffs' Equal Protection claims.

**B. Due Process.** The Fourteenth Amendment's Due Process clause provides, in relevant part, "No state shall ... deprive any person of life, liberty, or property, without due process of law."

---

12. While the Dresser Plaintiffs have alleged that Shane Dresser was unjustly denied a religious exemption, Plaintiffs have not indicated to the Court that any of his fellow students applied for a religious exemption and were granted that exemption, nor that any student in any school that has adopted a mandatory uniform requirement has granted such an exemption; thus, there can be no equal protection argument relating to inconsistent enforcement of the uniform requirement in relation to the religious exemption provision.

The bases for Plaintiffs' general Due Process claims are not readily apparent to the Court, though the Court understands the thrust of Plaintiffs' Due Process claims to be that Defendants' implemented their original uniform requirements without fully complying with Original CCSD Reg. 5131, and that the subsequent expulsion of some of the student Plaintiffs constituted a deprivation of their property and liberty interests in a public education. Specifically, Plaintiffs assert that the Clark County schools whose administrators are named in the Amended Complaint instituted mandatory uniforms without complying with the parental survey requirement contained in Original CCSD Reg. 5131. Plaintiffs further assert that Kim Jacobs was suspended on multiple occasions for her failure to abide by the original uniform requirement; that Shane Dresser was threatened with disciplinary action if he did not comply with the original uniform requirement, though he subsequently complied; and that Dwight Terry was sent to the principal's office on at least five occasions for the remainder of the day because he failed to abide by the original uniform requirement.[13]

In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court considered the question of whether students may lay claim to Due Process rights in the context of public education. In *Goss*, nine students brought suit under the Fourteenth Amendment's Due Process clause after being suspended from public high school in Columbus, Ohio, for up to ten days without a state law-mandated hearing. After considering the allegations, the *Goss* Court determined that high school students have a property interest in those benefits derived from their education and a liberty interest in their reputation, both of which implicate Due Process rights. In reaching that determination, the *Goss* Court found that the Ohio statute mandating that children attend school and another requiring a hearing in conjunction with school suspension were the source of a property interest in a public education in Ohio, and that the liberty interest resulted from the state's threatened injury to the students' good name, reputation, honor, or integrity, specifically the injury to the students' future opportunities in higher education and employment threatened by the suspension.

Similar to the Ohio statute discussed in *Goss*, NRS 392.040 mandates that all children between the ages of 7 and 17 attend public school, subject to specified exceptions. Further, Original CCSD Reg. 5131 required that a Clark County school conduct a parent survey under specified conditions and with specified results before a uniform requirement may be implemented—and enforced—under the regulation and NRS 392.458. Under the *Goss* Court's reasoning, this statute and regulation clearly give rise to a property interest in a public education in Nevada, and establishes procedural requirements that must be met before a student may be expelled for failure to comply with a mandatory dress code.

However, that determination alone does not end the Court's inquiry nor suffice to establish Plaintiffs' claims under the sum-

---

**13.** The Court notes at the outset of this discussion that the only cognizable Due Process claim is with respect to Original CCSD Reg. 5131's implementation, given that Plaintiffs have not alleged that any uniform requirement was adopted pursuant to Revised CCSD Reg. 5131 without meeting the revised regulation's parental involvement requirements. As has been noted elsewhere, Plaintiffs have failed to advance any basis for their assertion that the parental survey requirement changes made to Revised CCSD Reg. 5131 violate, in and of themselves, some aspect of the Due Process clause or NRS 392.458; accordingly, those assertions will be disregarded.

mary judgment standard. Plaintiffs have not substantiated any claim that student Plaintiffs Kim Jacobs, Shane Dresser, and/or Dwight Terry were sufficiently deprived of a property interest in the continuity of their education. Plaintiffs do not aver that Shane was ever suspended, only that he was threatened with such if he failed to comply with the uniform requirement. Plaintiffs assert that Dwight was sent to the principal's office at least five times during the Fall 2004 semester for his failure to comply with the mandatory uniform. It is undisputed that Kim was suspended on multiple occasions and finally expelled because of her refusal to comply with the mandatory dress code. Accordingly, only Kim and Dwight among the student Plaintiffs may assert that their education was actually interrupted in some manner by the premature application of a mandatory uniform.

In *Goss*, the Court briefly addressed and rejected the argument that a suspension of up to 10 days was too inconsequential an interruption to deprive students of their property interests under the Due Process clause. In doing so, however, the Court did distinguish between a de minimus exclusion from the educational process for a trivial period from those constituting more extended suspension. *See Goss*, 419 U.S. at 576, 95 S.Ct. at 737 (noting that "the total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child"). The *Goss* Court provided very little guidance as to how a lower court may determine what is a de minimus interruption other than to note in a footnote that multi-day suspensions probably implicate the Due Process clause. In considering Dwight Terry's allegations, the Court finds that Plaintiffs have not pled facts that, if true, would amount to more than a de minimus intrusion on his property interests in a continuing education. For a vari-

ety of reasons and conduct, students are routinely sent to the principal's office to be admonished or punished. Likewise, students are often subjected to in-class detention and the like for conduct that their teachers or other administrators dislike. During such detentions, it is often the case that students are encouraged (or required) to spend time on their school work, thereby causing as little interference as possible with the student's education, and often furthering it. While such detentions undoubtedly interrupt a student's day, they must be considered de minimus and beyond more formal process if the nation's school are to maintain their discipline and rigor. Accordingly, the Court finds as a matter of law that Dwight Terry's claims that time forcibly spent in his principal's office amounting to less than a full day of school per incident sufficiently interrupted his education to implicate a property interest under the Fourteenth Amendment's Due Process clause.

 With respect to Kim Jacobs, the Court finds that Plaintiffs have not sufficiently supported a property interest-based Due Process claim to survive summary judgment. Defendants have asserted that Kim was allowed to complete her schoolwork from home and did not experience any damages as a result of her noncompliance with Liberty's uniform requirement, and have buttressed that assertion with evidence indicating that Kim's record in school has not suffered and that, in fact, she performed better during the fall of 2004 while suspended than she did previous to her suspension. In essence, Defendants assert that there was no interruption in Kim's educational experience. Plaintiffs counter with the assertion that Kim experienced damages beyond those indicated by her school record, and that such a determination is one of fact that must be reserved for the jury. While Plaintiffs are

correct that this Court has previously indicated that Kim's absence from school on account of non compliance with the uniform requirement may have caused her damages that are not apparent solely by referring to her scholastic record, it is still incumbent upon Plaintiffs to provide some evidence of that damage in the face of Defendants' Motion, especially where the alleged damage is to her property interests in a continuing public education. While the resolution of the quantity of damages is a question of fact reserved for the jury to consider, Plaintiffs may not rest on mere allegation that there were damages when Defendants have provided evidence to the contrary in the context of summary judgment. Accordingly, the Court finds that Defendants are entitled to summary judgment against the Jacobs Plaintiffs' Due Process claims.

With respect to any assertion by Dwight or Kim that the school has interfered with their liberty interest in a clean academic record, the Court finds that Plaintiffs have failed to substantiate such a claim. Plaintiffs have nowhere alleged that Dwight's educational record has been tarnished in any way by his failure to abide by the uniform requirement. Regarding Kim, Defendants have submitted evidence in support of their assertion that all reference to Kim's non-compliance with the mandatory uniform policy, and the ensuing suspensions, have been stricken from her record. Plaintiffs have not countered this assertion in any way, let alone through the admissible evidence necessary to survive application of the summary judgment standard. Accordingly, the Court finds as a matter of law that neither Dwight Terry nor Kim Jacobs have substantiated a liberty interest claim against Defendants under the Due Process clause of the Fourteenth Amendment.

To the extent that any of the Plaintiffs assert that they are entitled to non-com-pensatory damages for the violation of their Due Process rights, the Supreme Court's decision in *Memphis Community School District v. Stachura* controls and precludes such recovery. 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Therein, the Supreme Court unequivocally held that constitutional violations brought under 42 U.S.C. § 1983 are premised on a tort standard of liability and, consequently, the abstract value of a constitutional right may not form the basis for § 1983 damages absent proof of actual injury. Such proof being absent here, Plaintiffs' claims under the Due Process clause fail.

■ **C. Plaintiffs' Claim for Interference with Parental Rights.** Plaintiffs appear to assert a Due Process claim for interference with parental rights that is distinct from the Due Process claim addressed above. The Supreme Court has determined that the Due Process clause contains a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Among other fundamental liberty interests, the Court has held that the "Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 65–66, 120 S.Ct. 2054. While Plaintiffs have failed to elucidate the exact nature of their claim, the Court understands Plaintiff parents to take issue with Nevada and Clark County's interference with their ability to direct what their children will wear.

The Fifth Circuit considered a similar parental rights challenge to a mandatory uniform policy in *Littlefield v. Forney Independent School District,* 268 F.3d 275 (5th Cir.2001). Therein, the Fifth Circuit

adopted that approach taken by the Second and Fourth Circuits and determined that, where parents' Due Process interest in directing the upbringing and education of their children conflict with the state's interest in providing and regulating a state public education system, the states' regulation is appropriately considered under rational-basis review. *See Littlefield,* 268 F.3d at 290–91 (referencing *Herndon v. Chapel Hill–Carrboro City Bd. of Educ.,* 89 F.3d 174, 177–79 (4th Cir.1996) and *Immediato v. Rye Neck Sch. Dist.,* 73 F.3d 454, 461 (2d Cir.1996)). Having considered the *Littlefield* Panel's decision and its analysis, the Court finds the Fifth Circuit's review and analysis of relevant predecents to be correct, and adopts the *Littlefield* Panel's conclusions respecting the appropriate standard of review for a dress code that is alleged to interfere with parental rights secured under the Due Process clause of the Fourteenth Amendment.

As the Court concluded in the context of Plaintiffs' Equal Protection clause, Defendants' actions in this matter meet the requirements of the rational basis test. Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiffs' Claim for Interference with Parental Rights.

## VI. Plaintiffs' State Law Claims

Plaintiffs allege multiple state law-based claims arising from the assertion that the mandatory dress codes at issue in this litigation, NRS 392.458, CCSD Reg. 5131, and Defendants' actions are unconstitutional. The Court addresses each in turn.

**A. Claim that CCSD Reg. 5131 violates NRS 392.458, and that individual school uniform policies violate NRS 392.458.** Plaintiffs assert in their Amended Complaint that CCSD Reg. 5131 itself violates NRS 392.458. After comparing the regulation against the statute, the Court finds as a matter of law that this claim is without merit. As previously outlined, NRS 392.458 authorizes Nevada school districts to establish a policy of mandatory school uniforms. In making that authorization, NRS 392.458 imposes four affirmative requirements on the school district wishing to establish a mandatory uniform policy: 1) that the school district's board of trustees consult with "schools within the district, parents and legal guardians of pupils who are enrolled in the district, and associations and organizations representing licensed educational personnel within the district" in establishing the policy; 2) that the policy describe the uniform; 3) that the policy designate which pupils must wear the uniforms; and 4) that the policy designate the hours or events during which the uniforms must be worn.

Plaintiffs have nowhere alleged that the district failed to include the schools, parents, and associations representing licensed educational personnel within the district in drafting and putting into effect either Original or Revised CCSD Reg. 5131. A quick comparison of NRS 392.458 and CCSD Reg. 5131 indicates that the regulation describes the uniform, designates which pupils must wear the uniform, and designates the hours or events during which the uniforms must be worn. These being the only affirmative requirements imposed on the uniform policy-drafting process by NRS 392.458, the Court finds as a matter of law that neither Original nor Revised CCSD Reg. 5131 violate the requirements of NRS 392.458.

Plaintiffs have also asserted that the uniform policies themselves violate NRS 392.458. Plaintiffs have provided the Court only with that uniform policy adopted by Liberty High, and thus the Court will consider only that school's uniform policy in conjunction with this claim. Having reviewed Liberty High's uniform

requirement, the Court finds that it is in accord with the requirements of NRS 392.458, in that it describes the uniform, designates which pupils must wear the uniform, and designates the hours or events during which the uniforms must be worn. To the extent that Plaintiffs base this claim on the allegation that some CCSD schools did not comply with the parental survey requirement of the Original CCSD Reg. 5131 and that the absence of such parental involvement in the adoption of CCSD Reg. 5131 violates NRS 392.458, such a claim is without merit. The section of NRS 392.458 that mandates parental involvement addresses adoption of the district-level policy, or CCSD Reg. 5131 itself, and not the implementation of a uniform requirement at the school level. Assuming, arguendo, that NRS 392.458 contemplated parental involvement in the adoption of the uniform requirement at the school level, Revised CCSD Reg. 5131 has superceded the original regulation, and no Plaintiff in this litigation has established that they suffered damages under the original prior to the adoption of the Revised CCSD Reg. 5131, nor that there was any impropriety in the implementation of the Revised CCSD Reg. 5131. Accordingly, the Court finds as a matter of law that Plaintiffs' claims on this point are without merit.

■ **B. Intentional Infliction of Emotional Distress.** Plaintiffs have asserted a claim for the tort of intentional infliction of emotional distress premised on Defendants' implementation and enforcement of the mandatory uniform code. In order to establish a cause of action for intentional infliction of emotional distress in Nevada, "a complaint must allege the following: (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) severe or extreme emotional distress suffered by the plaintiff; and (3) actual or proximate causation." *Jordan v.*

*State ex rel. Dept. of Motor Vehicles,* 110 P.3d 30, 52 (Nev.2005). In raising such a claim, "the plaintiff's complaint must specifically allege intent." *Id.* The Court views the pleading requirements set forth above in *Jordan* to go beyond specifying procedural requirements, such that correctly alleging the tortious cause of action is a substantive requirement of asserting such a claim.

■ After reviewing Plaintiffs' Amended Complaint, it is plainly evident that the Plaintiffs have failed to set forth a claim for which relief may be granted. The entirety of Plaintiffs' claim for intentional infliction of emotional distress (their Fifty–First Cause of Action in the Amended Complaint) reads as follows: "138. Plaintiffs reallege and incorporate by reference herein the allegations set forth above. 139. Defendants' actions have caused Plaintiffs to suffer significant emotional harm." Plaintiffs have not alleged that there was any extreme or outrageous conduct (other than implementing a mandatory uniform policy), nor that such conduct was done with the intention of/reckless disregard for causing anyone emotional distress. Further, Plaintiffs do not allege that they suffered severe or extreme emotional distress, but rather that they suffered "significant emotional harm." In the absence of such allegations, Plaintiffs claim for intentional infliction of emotional distress must fail as a matter of law, even under the less stringent motion to dismiss standard.

Even assuming, arguendo, that Plaintiffs have asserted a valid claim for intentional infliction of emotional distress in their Amended Complaint, Plaintiffs have not offered any evidence to support their claim that the imposition of a mandatory uniform policy was "extreme and outrageous conduct," that the uniform policy was implemented with the intention of/reckless dis-

regard for causing emotional distress, or that Plaintiffs have indeed suffered "severe or extreme emotional distress." Given the Plaintiffs' very vague and completely unsupported allegations, the Court finds that summary judgment is warranted with respect to Plaintiffs' claim for intentional infliction of emotional distress.

## VII. Plaintiffs' Cross Motion for Partial Summary Judgment

In conjunction with their Supplemental Opposition to Defendants' Motion, Plaintiffs have filed a Cross Motion for Summary Judgment, requesting that this Court declare NRS 392.458, CCSD Reg. 5131, and Defendants' conduct under that law unconstitutional. Because the Court finds that the very opposite is the case, Plaintiffs' Cross Motion for Partial Summary Judgment will be denied.

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendants' Motion to Exceed Page Limit (# 24) is GRANTED;

IT IS FURTHER ORDERED that Sections VI.D.4.a. and V. be stricken from CCSD Reg. 5131;

IT IS FURTHER ORDERED that Defendants' Motions to Dismiss/Summary Judgment (## 17, 22) are GRANTED;

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment (# 29) is DENIED.

The Clerk of Court shall enter judgment accordingly.